17-2444 (L)
*United States v. Afriyie*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2018

(Argued: November 14, 2018                    Decided: July 8, 2019)

Docket Nos. 17-2444, 17-4045

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

JOHN AFRIYIE,

*Defendant-Appellant*.

_____

Before: JACOBS, POOLER, and WESLEY, *Circuit Judges*.

John Afriyie appeals from a judgment of conviction entered on July 28,

2017, an order of forfeiture entered on July 27, 2017, and a restitution order

entered on December 11, 2017, by the United States District Court for the

Southern District of New York (Paul A. Engelmayer, *J.*), following a one-week

jury trial. The jury found Afriyie guilty of both counts with which he was charged: (1) securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, and (2) wire fraud, in violation of 18 U.S.C. § 1343. Afriyie was sentenced principally to 45 months' imprisonment, to be followed by three years' supervised release. The district court imposed forfeiture in the amount of $2,780,720.02 and restitution in the amount of $663,028.92.

We affirm the judgment of conviction, finding no error in the district court's jury instructions, admission of lay testimony, and calculation of loss. We hold that, as a matter of law, forfeiture is not limited to the amount of funds acquired through illegal transactions in an insider-trading scheme; rather, forfeiture may extend to appreciation of those funds. We therefore affirm the forfeiture calculation and order in this case. Because *Lagos v. United States*, 138 S. Ct. 1684 (2018), decided after Afriyie's sentencing, addresses the categories of fees recoverable under the Mandatory Victims Restitution Act, limited remand to recalculate restitution is appropriate.

Affirmed in part, vacated in part, and remanded.

_____

        ROBERT A. CULP, Garrison, N.Y., *for Defendant-Appellant*.

EDWARD A. IMPERATORE, Assistant United States Attorney (Christine Magdo, Daniel B. Tehrani, Assistant United States Attorneys), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, N.Y., *for Appellee*.

POOLER, Circuit Judge:

John Afriyie appeals from a judgment of conviction entered on July 28, 2017, an order of forfeiture entered on July 27, 2017, and a restitution order entered on December 11, 2017, by the United States District Court for the Southern District of New York (Paul A. Engelmayer, *J.*), following a one-week jury trial. We affirm the judgment of conviction, finding no reversible error in the district court's jury instructions, admission of lay testimony, and calculation of loss. We hold that, as a matter of law, forfeiture is not limited to the amount of funds acquired through illegal transactions in an insider-trading scheme; rather, forfeiture may extend to appreciation of those funds. We therefore affirm the forfeiture calculation and order in this case. Because *Lagos v. United States*, 138 S. Ct. 1684 (2018), decided after Afriyie's sentencing, addresses the categories of fees recoverable under the Mandatory Victims Restitution Act, we vacate the restitution order and remand for the district court to recalculate restitution.

# BACKGROUND

In January 2015, Afriyie began working as an investment analyst for MSD Capital ("MSD"). As an investment analyst, Afriyie researched potential investments for MSD and made recommendations regarding those investments. MSD barred its employees from trading in any individual securities from their own accounts.

In January 2016, Apollo Global Management ("Apollo"), a private equity firm, was considering acquiring ADT Corp. ("ADT"), a publicly traded company in the home security and alarm industry. Apollo contacted several investment firms, including MSD, to raise capital in order to make this acquisition. After MSD expressed an interest in investing, Apollo agreed to provide MSD with material nonpublic information ("MNPI") about the ADT deal.

Around this time, MSD's compliance department sent a "potential restriction" email to its investment professionals. The email indicated that MSD would receive MNPI about a "U.S. listed alarm monitoring services company" because of a "financing opportunity in connection with a potential take-private transaction by . . . Apollo Global" that was "expected to close in [the first half of]

2016." App'x at 186-87; Trial Tr. at 473-77, ECF No. 109.[1] Afriyie received this email.

The next morning, on January 28, Afriyie accessed the ADT and Apollo research folders on MSD's shared drive. After doing so, he purchased his first ADT call option. That afternoon, MSD added ADT to its list of "restricted" securities, and Afriyie received an email to this effect. Taken together, the restriction emails Afriyie received informed him that Apollo was planning to acquire ADT. The next day, Afriyie purchased an additional 35 ADT call options. On February 2, although he was not assigned to work on the ADT project, Afriyie accessed documents specific to the Apollo-ADT deal stored on MSD's shared drive. He subsequently purchased over 2,000 additional ADT call options over the course of the ensuing two weeks.

On February 16, Apollo publicly announced its planned acquisition of ADT. ADT's stock price rose by 47.5%, and the value of Afriyie's investment in ADT call options increased by 6,000% in one day. Over the course of the following week, Afriyie sold his options for a total profit of $1,564,071.60. In late

---

[1] All ECF citations are to the district court docket, *United States v. Afriyie*, No. 16-cr-377 (S.D.N.Y. Feb. 27, 2017).

5

February and March 2016, he wired a portion of the proceeds out of his brokerage account and into a separate savings account.

Afriyie was arrested and released on bail on April 13, 2016. Two days later, he changed the name on the email address associated with the brokerage account from his own name to his mother's name and later deactivated the email account. Afriyie also called TD Ameritrade and, on several occasions, pretended to be his mother on the phone.

On June 1, 2016, an indictment was filed charging Afriyie with two counts of criminal activity stemming from trading on MNPI obtained from his employer. Count One charged him with securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5. Count Two charged him with wire fraud, in violation of 18 U.S.C. § 1343. Following a week-long trial, a jury found Afriyie guilty of both counts. The district court sentenced him principally to a term of 45 months' imprisonment, followed by three years' supervised release, and it imposed forfeiture in the amount of $2,780,720.02 and restitution in the amount of $663,028.92. Afriyie is serving his sentence.

## DISCUSSION

On appeal, Afriyie primarily argues that 1) there was reversible plain error in the district court's jury instructions; 2) the district court plainly erred in admitting certain lay testimony; 3) the district court erred in calculating the loss and forfeiture amounts; and 4) remand in order to recalculate restitution is appropriate. For the following reasons, we reject Afriyie's first three arguments. However, as the government concedes, limited remand for recalculation of restitution is appropriate in light of *Lagos v. United States*, 138 S. Ct. 1684 (2018), decided after Afriyie's sentencing.

## I.    Jury Instructions

"We review challenged jury instructions *de novo* but will reverse only if all of the instructions, taken as a whole, caused a defendant prejudice." *United States v. Bok*, 156 F.3d 157, 160 (2d Cir. 1998). It is the defendant's burden to show prejudice. *United States v. Nektalov*, 461 F.3d 309, 313-14 (2d Cir. 2006) (internal quotation marks omitted). "[A] jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Bok*, 156 F.3d at 160 (internal quotation marks omitted).

First, Afriyie argues that the district court committed plain error[2] in failing

to explain to the jury what constitutes a fiduciary duty under the legal standard

set forth in *United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991). Under *Chestman*,

"a person violates [17 C.F.R. § 240.10b-5] when he misappropriates material

nonpublic information in breach of a fiduciary duty or similar relationship of

trust and confidence and uses that information in a securities transaction." *Id.* at

566.

At the charge conference, Afriyie did not object to the district court's

proposed instruction regarding fiduciary relationship, which the court had

issued to the parties in advance of the meeting. Accordingly, we review only for

plain error. *See United States v. Crowley*, 318 F.3d 401, 412 (2d Cir. 2003). At trial,

the district court instructed the jury:

> In order to find that the government has established . . . that the
> defendant engaged in an insider trading scheme, you must find that
> the government has proven beyond a reasonable doubt each of the
> following two factors, that taken together, constitute an insider
> trading scheme under the federal securities law. The two facts are as
> follows:
>
> One, that the defendant had a relationship of trust and confidence
> with MSD Capital;

[2] "To establish plain error, the defendant must establish (1) error (2) that is plain and (3) affects substantial rights." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007).

8

> Two, that the defendant violated his duty of trust and confidence by using material, nonpublic information that he obtained by virtue of his relationship with MSD Capital to trade ADT securities for his own personal benefit.
>
> Now, in order for you to establish the first factor concerning the existence of a relationship of trust and confidence, you must welcome all of the facts and circumstances and ask whether both the defendant and MSD Capital recognized that their relationship involved trust and confidence.

App'x at 52-53.

Afriyie argues that the district court's instruction failed to explain what constitutes a fiduciary duty or similar relationship of trust and confidence, omitted the key elements of reliance and de facto control, and failed to instruct the jury that there can be no breach absent a duty to disclose. An express agreement of confidentiality may establish fiduciary status. *See Chestman*, 947 F.2d at 571. Afriyie does not dispute that on his first day of employment with MSD, he signed a confidentiality agreement. The agreement stated: "I understand that my employment with MSD creates a relationship of confidence and trust between MSD and me." Trial Tr. at 192, ECF No. 101. Afriyie presented no evidence to counter this agreement or to indicate that he lacked a fiduciary or other similar relation of trust and confidence with MSD. Accordingly, any error in the district court's instruction did not result in prejudice; viewing the charge

actually given as a whole, *see United States v. Feliciano*, 223 F.3d 102, 116 (2d Cir. 2000), the outcome of the trial would have been the same had Afriyie received the instruction he sought.

Second, Afriyie argues that the district court failed to instruct the jury that the burden of proof remained on the government at all times, and thus it failed to convey his theory-of-the-defense instruction. Afriyie did not object or renew his request for his submitted instruction following the charge conference. Accordingly, we review only for plain error. *See Crowley*, 318 F.3d at 412-14. At trial, the court instructed the jury:

> If the government proves beyond a reasonable doubt . . . that the defendant engaged in an insider trading scheme, it must then prove that the defendant engaged in that scheme knowingly, willfully, and with intent to defraud MSD Capital . . . . It is for you to determine whether the government has established beyond a reasonable doubt such knowledge and intent on the part of the defendant.

> Because an essential element of the crime charged is intent to defraud, good faith on the part of the defendant is a complete defense to the charge of insider trading. That is, the law is not violated if the defendant held an honest belief that his acts were proper and not [in] furtherance of any unlawful scheme. A person who acts on a belief or reason honestly held that turns out to be wrong is not punishable under these statutes.

App'x at 55-57.

There was no error. "[T]he district court must advise the jury in unambiguous terms that the government at all times bears the burden of proving beyond a reasonable doubt that the defendant had the state of mind required for conviction on a given charge." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). The district court did so here. *See* App'x at 55-57; *see also* App'x at 30 ("[T]he burden remains on the government to prove all elements of each offense beyond a reasonable doubt."). Furthermore, as detailed above, the district court explained that "good faith on the part of the defendant is a complete defense," App'x at 56-57, thus conveying Afriyie's theory that he lacked knowledge that he was trading based on MNPI. There was therefore no error in the district court's good faith instruction.

## II. Admission of Lay Testimony

"We review evidentiary rulings for abuse of the district court's broad discretion, reversing only when the court has acted arbitrarily or irrationally." *Nektalov*, 461 F.3d at 318 (internal quotation marks omitted). Where, as here, the defendant did not object, we review only for plain error. *See United States v. Hsu*, 669 F.3d 112, 118 (2d Cir. 2012).

Afriyie challenges the admission of nonexpert testimony on whether certain information provided by Apollo was nonpublic; the likelihood of the Apollo-ADT deal; and projections of Apollo's pricing of ADT stock. To begin, Afriyie asserts that MSD employee-witness Sharmit Grover "was permitted, without basis, to offer expert opinions about documents, usurping the jury's province and calling them 'material' or 'nonpublic' when the documents were created by or for *Apollo* and consequently the witness[] had no basis for the opinions." Appellant's Br. at 35.

"The Federal Rules of Evidence allow the admission of fact testimony so long as the witness has personal knowledge, while opinion testimony can be presented by either a lay or expert witness." *United States v. Cuti*, 720 F.3d 453, 457-58 (2d Cir. 2013) (citations and footnote omitted). "[T]he distinction between statements of fact and opinion is, at best, one of degree." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988). "[P]ersonal knowledge of a fact is not an absolute to Rule 602's foundational requirement, which may consist of what the witness thinks he knows from personal perception. Similarly, a witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior." *Cuti*, 720 F.3d

458-59 (internal quotation marks and citation omitted). If the witness is not testifying as an expert, the witness' opinion is limited to those opinions which are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.  An employee's testimony "grounded in" an investigation he undertook in his role as an employee is admissible under Rule 701; to the extent the employee's testimony reflects "specialized knowledge [resulting from] extensive experience," however, it is not. *Bank of China v. NMB LLC*, 359 F.3d 171, 181-82 (2d Cir. 2004).

Grover is a managing director at MSD Partners, an entity related to MSD Capital, and he worked on the Apollo-ADT transaction.[3] Grover testified that around January 2016, Apollo entered into a nondisclosure agreement with MSD and had confidential discussions with Grover and others about whether MSD would provide financing for the acquisition. Grover reviewed many nonpublic documents as part of his work determining whether MSD should provide financing. He testified that the nonpublic deal documents were saved on MSD's

---

[3] We refer to both entities collectively as "MSD."

13

shared drive. Grover further explained how he used and evaluated the documents in evaluating the economics of the proposed transaction.

The documents about which Grover testified were already in evidence because they were introduced by an MSD IT specialist who retrieved them from the shared drive. Furthermore, Grover testified based upon his firsthand participation in the evaluation of the potential transaction. Therefore, the district court did not err in permitting Grover to testify as to whether certain information was nonpublic.

With respect to Grover's testimony regarding the likelihood of the Apollo-ADT deal and his projections of Apollo's pricing of ADT stock, Grover referred to his firsthand participation in the evaluation of the potential transaction. Unlike in cases cited by Afriyie, Grover had contemporaneous involvement with the transactions at issue, *compare with Bank of China*, 359 F.3d at 181-82; he explained how he compiled the summary chart, *compare with United States v. Citron*, 783 F.2d 307, 316-17 (2d Cir. 1986); and he did not provide his opinion as to Afriyie's role in the charged fraud, *compare with United States v. Groysman*, 766 F.3d 147, 158-62 (2d Cir. 2014).

Nevertheless, Grover's testimony about the investigation he undertook in his role as an employee also referred to his specialized knowledge. For example, when asked whether "[i]n [his] *experience*, there are instances in which a private equity firm may say one thing publicly and do a different thing privately," Grover responded, "Yes . . . . [S]aying that transactions are difficult to do [is intended to make] sellers . . . reduce their expectations on sale price . . . . It's the . . . type of dynamic that plays out in the investments world." Trial Tr. at 489-90 (emphasis added). Similarly, Grover testified that his analysis of Apollo's pricing of ADT stock was "the type of analysis that an analyst would perform," and that his underlying assumptions—including assumptions regarding fees and expenses, as well as estimates of the number of outstanding ADT purchase options—were "commonly used metrics in the industry." Trial Tr. at 511-12.

Although Grover's testimony at times noted or was colored by his specialized knowledge, any error in admitting it was not plain. The government presented overwhelming evidence that Afriyie had accessed MSD's confidential information regarding ADT before making the trades at issue, and Grover's opinion about how these documents could have helped Afriyie commit insider trading merely went toward explaining an internal process. The jury could

15

readily have determined that Afriyie used confidential information to fraudulently trade, even if the precise ways in which he used that information were unclear. Because any error was not plain and did not affect Afriyie's substantial rights, we affirm.

## III. Loss and Forfeiture

"We review the district court's factual findings at sentencing for clear error, bearing in mind that the standard of proof at sentencing is a preponderance of the evidence." *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (internal quotation marks omitted). Afriyie argues that, at minimum, his case should be remanded for resentencing proceedings because he "was sentenced as if it were a certainty that the jury convicted on every transaction," which "infected the sentencing record as to loss calculations, forfeiture, and restitution." Appellant's Br. at 45.

### A. Loss Calculation

The Presentence Report determined that a 16-level enhancement applied because Afriyie's insider-trading gain was $1.53 million. *See* U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(B)(1)(I). This figure, $1.53 million, is the profit Afriyie made by selling the ADT call options. Afriyie objected to the loss calculation. Because

the jury returned a general verdict, he argued, first, the district court should have enhanced his sentence only for the smallest gain he made on a single trade, and second, if the district court were to consider all of his trades as relevant conduct, it should have applied a clear and convincing evidentiary standard.

At sentencing, the district court, agreeing with the Presentence Report, found that the evidence reflected a $1.53 million gain. The district court discussed two reasons in particular underlying its conclusion as to loss:

> I am not persuaded by that argument [that the court is limited to considering only the gain attributed to the trade that yielded the smallest gain] for two independent reasons: First, at sentencing the Court is to make an independent calculation of how the guidelines apply. Here, even on the theory that the defense posits that the jury found Mr. Afriyie guilty based on just one trade and did not base its guilty verdict on any other trades, the Court finds based on the overwhelming evidence at trial that this was a unitary scheme. Every trade by Mr. Afriyie in [ADT], every one of the exotic call options that he customized and purchased was based on . . . MNPI that he had obtained from MSD's database; to wit, information that Apollo planned [to acquire] ADT at a significant stock price premium.

> The Court finds without any hesitation that each and every one of those trades occurred when Mr. Afriyie was in possession of that MNPI and that that confidential and highly material and market-moving information was the impetus for each and every one of Mr. Afriyie's purchase of call options. And, of course, after the announcement of the Apollo-ADT transaction, those call options were very much in the money and proved to be extremely valuable, and Mr. Afriyie exercised them.

17

. . . .

> The second reason—and again, it's independent of the first—is that the jury's forfeiture finding compels the same result. That finding was made by a preponderance of the evidence. That is the same standard that governs the Court's guidelines determination as to gain. The jury found that the full $1.53 million represented gains from the insider trading scheme, and it did so in the face of the same argument made here, which is that the information known to Mr. Afriyie and known to the public were at times of the different trades. So, the bottom line, the Court finds a 16-level upward adjustment for gain to be appropriate.

App'x at 99-101.

Afriyie relies on *United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001) to argue that where a jury returns a general verdict, "sentencing must be based on the least punitive possible verdict." Appellant's Br. at 46. But here, unlike in *Sturdivant*, the district court did not "erroneously assume[] that [the] defendant had been convicted based on" multiple transactions. *Sturdivant*, 244 F.3d at 77. Instead, the district court acknowledged the general verdict and cited two independent bases for its calculation: the evidence at trial and the jury's forfeiture verdict. The loss calculation was not clearly erroneous; indeed, remanding for resentencing would simply require the district court to reiterate the determinations that it already has made.

18

## B. Forfeiture Calculation

Afriyie next asserts that the "same flaws" as to the loss calculation "afflicted the forfeiture determination albeit more profoundly." Appellant's Br. at 49. We disagree.

"[18 U.S.C.] § 981(a)(2)(B) supplies the definition of 'proceeds' in cases involving fraud in the purchase or sale of securities." *United States v. Contorinis*, 692 F.3d 136, 145 n.3 (2d Cir. 2012). Pursuant to Section 981(a)(2)(B), "[t]he definition of proceeds for insider trading violations is the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." *Id.* at 145 (internal quotation marks omitted). "In any case tried before a jury, if the indictment or information states that the government is seeking forfeiture, the court must determine before the jury begins deliberating whether either party requests that the jury be retained to determine the forfeitability of specific property if it returns a guilty verdict." Fed. R. Crim. P. 32.2(b)(5)(A).

In the forfeiture phase of the trial, the court issued the following jury instruction, to which Afriyie did not object:

> The term "proceeds" means the amount of money acquired through the illegal transaction or transactions engaged in by the defendant,

less the direct costs he incurred in engaging in this transaction or transactions.

The proceeds of transactions that you do not determine to constitute insider trading, if any, are, of course, not proceeds of crimes. Your determination at this stage of whether a particular transaction constitutes insider trading by the defendant, is governed by the preponderance of the evidence standard.

. . . .

Assets purchased with crime proceeds are forfeitable even if they increase or appreciate in value, to grow greater than the original monies obtained from the crime. Where the present balance of a particular account is attributable to the appreciation made from the criminal proceeds in that account, the assets and funds in that account constitute or are derived from fraud proceeds and, therefore, are forfeitable.

App'x at 76-77, 79. The jury then received a forfeiture special verdict form, which required it to make specific findings as to the funds in the savings and brokerage accounts and whether the money in those accounts constituted proceeds directly or indirectly obtained as a result of the convictions on Counts One and Two. The jury had to indicate whether the full amount of funds, or some lesser portion, was forfeitable. It concluded that the full amount was derived from the proceeds of Afriyie's crimes.

The district court imposed forfeiture in the amount of $2,780,720.02. This amount represents $2,632,893.39, which is the liquidated value of the assets

20

formerly held in the brokerage account and seized on May 16, 2016, together

with $147,826.63, the amount of proceeds of the offenses wired from the

brokerage account into the savings account between February 17 and March 24,

2016.

Afriyie's key challenge on appeal concerns the appreciated value. As noted

above, proceeds here include "the amount of money acquired through the illegal

transactions resulting in the forfeiture, less the direct costs incurred in providing

the goods or services." *Contorinis*, 692 F.3d at 145 (internal quotation marks

omitted). The jury instruction as to "proceeds" was thus correct. Afriyie goes on

to argue, however, that insider-trading forfeiture is limited to the funds acquired

through illegal transactions and excludes any appreciation of those funds.

Under 18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c),[4] a

defendant convicted of insider trading must forfeit "[a]ny property, real or

personal, which constitutes *or is derived from* proceeds traceable" to the offense.

18 U.S.C. § 981(a)(1)(C) (emphasis added). We have yet to squarely address the

import of "derived from" as it relates to appreciated value in an insider-trading

---

[4] "While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c). This roundabout statutory mechanism allows a court to order forfeiture in criminal securities fraud proceedings." *Contorinis*, 692 F.3d at 145 n.2.

scheme. *Cf. United States v. Kalish*, No. 6-cr-656(RPP), 2009 WL 130215, at *6 (S.D.N.Y. Jan. 13, 2009) ("[I]t is a fair conclusion that the present balance in the Lehman Brothers account is attributable to appreciation made from the TFS proceeds in various investment accounts. Therefore, this Court finds that the entire $2.4 million in assets currently in the Lehman Brothers account constitutes or was derived from fraud proceeds and thus is forfeitable."), *aff'd*, 626 F.3d 165, 168 (2d Cir. 2010).

We hold that as a matter of law, forfeiture may extend to the appreciation of funds acquired through illegal transactions in an insider-trading scheme. There is simply no basis in the text to conclude, as Afriyie argues, that Section 981(a)(2), which defines "proceeds," restricts Section 981(a)(1)(C) from applying to funds that have appreciated in value. A defendant convicted of insider trading must forfeit property "which constitutes . . . proceeds," 18 U.S.C. § 981(a)(1)(C), defined as "the amount of money acquired through the illegal transactions," *id.* § 981(a)(2)(B). Thus, if Section 981(a)(1)(C) applied only to property "which constitutes . . . proceeds," Afriyie's argument may have teeth. But the text provides that a defendant convicted of insider trading must *also* forfeit property which is "derived from proceeds traceable" to the offense. *Id.* § 981(a)(1)(C). The

plain text compels our conclusion that a defendant convicted of insider trading must forfeit the appreciation of funds acquired through illegal transactions in an insider-trading scheme, because such funds are "derived from proceeds traceable" to the offense. *Id.*

Afriyie's final two arguments urging us to conclude the contrary are unavailing. First, he argues that this Court should apply the rule of lenity because "proceeds" is ambiguous. This is because, Afriyie argues, Section 981(a)(2)(B) "strictly limits 'proceeds' to 'the amount of money acquired through the illegal transactions . . . less the direct costs incurred in providing the goods or services,'" while Section 981(a)(2)(A) "extends 'proceeds' to include 'property of any kind obtained directly or *indirectly*, as the result of the commission of the offense.'" Appellant's Reply Br. at 24 (alteration in original) (quoting 18 U.S.C. § 981(a)(2)). According to Afriyie, Congress wanted "indirect" acquisition to apply under Section 981(a)(2)(A), but not Section 981(a)(2)(B). For the reasons above, however, it cannot be said that "after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended," such that the rule of lenity applies here. *Reno v. Koray*, 515 U.S. 50, 65 (1995) (citation and internal quotation marks omitted).

Second, Afriyie argues that when defense counsel indicated that Afriyie accepted the verdict but wanted to testify that certain trades were not insider trading, the government "threatened [him] with a perjury enhancement" and thus "he was intimidated into only testifying as to forfeiture calculation rather than specific trades as intended." Appellant's Reply Br. at 27. This, Afriyie asserts, mandates retrial on forfeiture.

"[A] defendant pressing such a claim must show bad faith on the part of the government." *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000). "[I]n order to elevate this misconduct to a due process violation, the defendant must demonstrate that the absence of fundamental fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Id.* at 29-30 (internal quotation marks omitted). Here, there is no indication that the precautionary statements about perjury rose to the level of intimidation. Afriyie has failed to show bad faith or the absence of fundamental fairness with respect to such precautions, and we affirm the district court's calculation of forfeiture.

## IV. Restitution

The district court ordered that Afriyie pay $663,028.92 in restitution to his former employer, MSD. This amount "correspond[ed] to expenses [MSD]

incurred as a result of its participation in investigations into, and the eventual trial concerning, Afriyie's insider trading while working as an analyst at MSD." Order of Restitution at 1, ECF No. 178.[5] After Afriyie's sentencing, the Supreme Court issued its decision in *Lagos v. United States*, 138 S. Ct. 1684 (2018). In *Lagos*, the Court interpreted the Mandatory Victims Restitution Act and held that a private firm's legal fees as to a corporate victim's private investigation and related civil case were not compensable as "necessary" restitution. *Id*. at 1688-89. Afriyie submitted a supplemental brief addressing *Lagos* and seeking remand to determine the correct restitution amount. The government "consents to a limited remand to allow the District Court to determine whether certain categories of expenses encompassed in the original restitution award were incurred 'during participation in the investigation or prosecution of the offense,' 18 U.S.C. § 3663A(b)(4), consistent with the Supreme Court's guidance in *Lagos*." Appellee's Br. at 58-59. Accordingly, remand to recalculate restitution is appropriate.

---

[5] Although the district court held at Afriyie's sentencing hearing that MSD was entitled to $691,046.62 in restitution, MSD "voluntarily disclaimed restitution for expenses associated with counsel's monitoring of, and attendance at, proceedings in this case." Order of Restitution at 2, ECF No. 178. Accordingly, MSD sought $663,028.92, rather than $691.046.42. *Id.*

## CONCLUSION

We have considered the remainder of Afriyie's arguments and find them to be without merit. For the foregoing reasons, the judgment of conviction and order of forfeiture are hereby AFFIRMED, the restitution order is VACATED, and the case is REMANDED.